[Cite as *State v. Boyd*, 2020-Ohio-3450.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                    :

    Plaintiff-Appellee,        :

                                    No. 108552

    v.                                  :

CHANTEL BOYD,                   :

    Defendant-Appellant.   :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 25, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-16-606620-B

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney,
and Kristin M. Karkutt, Assistant Prosecuting Attorney, *for
appellee.*

Russell S. Bensing, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Defendant-appellant Chantel Boyd ("appellant") was convicted of a

misdemeanor offense of endangering children following a jury trial. On appeal, she

argues her conviction was supported by insufficient evidence and was against the

manifest weight of the evidence. After a review of the record and applicable law, we affirm her conviction.

**Procedural and Factual History**

{¶ 2} The victim baby, born on January 27, 2016, is appellant's second child with her husband Chad Medley. On May 22, 2016, appellant's mother, the baby's maternal grandmother, went to appellant's residence. Appellant was there with her two children, the baby and a two-year old boy. After grandmother arrived, appellant left to go to the store. When grandmother checked on the baby, his eyes were "gurgitating" and his head was swollen. When appellant returned home, grandmother told her something was wrong with the baby, and appellant called 911. Appellant and Medley were later arrested at the hospital for suspected child abuse. The baby was eventually discovered to have suffered a nonaccidental subdural hematoma.

{¶ 3} Appellant and Medley were subsequently indicted in a two-count joint indictment. Under Count 1, they were charged with a second-degree felony of endangering children as defined in R.C. 2919.22(B)(1) (child abuse); under Count 2, they were charged with a third-degree felony of endangering children as defined in R.C. 2919.22(A) (creating a substantial risk to the child's health or safety by violating a duty of care, protection, or support). Both counts contained a "furthermore" clause, alleging the offense resulted in serious physical harm to the child. The matter proceeded to a joint jury trial. At the conclusion of the state's case, both defendants moved for an acquittal under Crim.R. 29. The trial court denied the motion.

{¶ 4} The jury acquitted both appellant and Medley of Count 1 and found both of them guilty of Count 2, endangering children in violation of R.C. 2919.22(A) (creating a substantial risk to the child's health or safety by violating a duty of care, protection or support), but not guilty of the furthermore clause (resulting in serious physical harm). As a result, they were convicted of a first-degree misdemeanor offense of child endangering instead of a third-degree felony. The trial court imposed a two-year community control sanction on both appellant and Medley for their offense.

{¶ 5} Medley appealed his conviction, contending his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. This court found both claims to be without merit and affirmed his conviction in *State v. Medley*, 8th Dist. Cuyahoga No. 105760, 2018-Ohio-1391.

{¶ 6} Appellant filed a delayed appeal.[1] She also argues her conviction was supported by insufficient evidence and was against the manifest weight of the evidence. The two assignments of error state:

---

[1] We note that appellant filed a delayed appeal in this case. In seeking leave to file a delayed appeal, her counsel explained that although counsel was appointed soon after appellant's conviction on April 4, 2017, counsel did not become aware of his appointment in this appeal until May 2019. This court granted the delayed appeal. As a result of the delay, appellant has served the two-year community control sanction by the time she appealed her conviction on May 10, 2019. Pursuant to *State v. Wilson*, 41 Ohio St.2d 236, 325 N.E.2d 236 (1975), where a defendant has completed the sentence, an appeal is moot when no evidence is offered from which an inference can be drawn that the defendant will suffer some collateral disability from a conviction. The state, however, did not raise the mootness issue when it filed appellee's brief. Subsequently, this court sua sponte ordered the parties to address the issue of whether the appeal was moot and appellant filed a

I. The trial court entered a verdict of conviction which was based upon insufficient evidence in violation of Defendant's rights to due process of law under the 14th Amendment to the United States Constitution.

II. The trial court entered a verdict of conviction which was against the manifest weight of the evidence, in violation of Defendant's rights to due process under the 14th Amendment to the United States Constitution.

**Standard of Review**

{¶ 7} When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 8} A manifest weight challenge, on the other hand, questions whether the state has met its burden of persuasion. *Thompkins* at 390. This challenge raises a factual issue:

supplemental brief in response, attaching an affidavit by her, which identified several areas of collateral disabilities.

"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The word "manifest" in the standard of review "means that we can only reverse the trier of fact if its decision is very plainly or obviously contrary to the evidence." *State v. Hernandez*, 8th Dist. Cuyahoga No. 106577, 2018-Ohio-5031, ¶ 20.

**Trial Testimony**

{¶ 9} At trial, the state presented eight witnesses, including the baby's maternal grandmother, the baby's paternal grandfather (Medley's father), the paramedic who responded to the 911 call, the police officer who arrested appellant and Medley at the hospital, two social workers from Cuyahoga County Division of Children and Family Services ("CCDCFS"), the detective who investigated this case, and the doctor who diagnosed the child to have suffered subacute subdural hematoma.

**Maternal Grandmother**

{¶ 10} The baby's maternal grandmother, appellant's mother (hereafter "grandmother"), testified that she babysat the baby as often as twice a week. Her daughter worked from 11:00 p.m. to 7:00 a.m., and Medley's scheduled varied. She

typically watched the baby at another daughter's house, where other children would also be present. Grandmother knew the baby had vomiting issues, and she would let appellant and Medley know whenever it happened. Appellant frequently took the baby to the doctor. Grandmother testified that both appellant and Medley were loving parents and she had never seen them mishandle the baby.

{¶ 11} In the morning of May 22, 2016, grandmother went to appellant's residence to get something from the house. Medley had gone to work, and appellant was in the house by herself with the baby and the two-year-old. After grandmother arrived, appellant told her she needed to run some errands and left the house. When grandmother went to check on the baby, his eyes were "gurgitating." She was concerned because he had never looked like this before. An hour later, when appellant returned home, grandmother told her something was wrong with the baby. Appellant called 911.

{¶ 12} Appellant's mother acknowledged that she had been convicted of aggravated assault and theft 11 years ago and her own children had been placed in the custody of CCDCFS due to neglect, but testified she had never been accused of abusing her children. When asked if she was aware that appellant was implying she abused the baby, she replied that she would never believe it. Grandmother testified that she never shook the baby and never witnessed anyone abuse him either.

**Paternal Grandfather**

{¶ 13} Paternal grandfather, Medley's father, testified the baby was often sick and "in and out of the hospital every other week." He did not know the baby's

medical issues, other than his inability to keep milk down.  He testified appellant and Medley were good parents.  He had no knowledge of them ever harming the baby.

**Paramedic and Police Officer**

{¶ 14} Brendan Dunn, a paramedic who responded to appellant's 911 call on May 22, 2016, testified that appellant appeared upset and concerned about the baby, and told Dunn that the baby had been shaking for approximately one minute and was "acting funny."  The baby was lying on the floor with appellant next to him, and he appeared postictal, meaning he was acting like he had just had a seizure.  He tried to get a medical history of the child from appellant, but she did not provide any pertinent information.  Appellant told Dunn that she was working all night and the baby's father was with the child, and appellant's mother was the last person with the baby when the baby started having the seizure-like symptoms.  Appellant also mentioned the baby was lethargic and had not been drinking or eating for the last two days.

{¶ 15} Dunn transported the baby to Rainbow Babies and Children's Hospital.  He also called 696-KIDS, a hotline which certain professionals are legally obligated to call and make a report if they find something out of the ordinary involving a child in Cuyahoga County.

{¶ 16} Officer Christopher Gillard of the Cleveland police responded to the report of suspected child abuse.  He saw the baby in a hospital bed with a tube in his mouth and his eyes swollen shut.  After the officer consulted with the medical

professionals and other law enforcement officials, the decision was made to arrest appellant and Medley.

**Social Worker and Child Protection Specialist**

{¶ 17} Lois Graham, a social worker with CCDCFS, was assigned to the case while the baby was in the hospital. She recommended that the baby not return home to his parents upon his release from the hospital. When the baby was released from the hospital three weeks later on June 17, 2016, he was immediately placed in foster care. Graham visited the baby in foster care; he was eating well, had gained weight, and was progressing.

{¶ 18} Lorianne Delsignore, a child protection specialist with CCDCFS, was assigned to investigate the case. Her investigation indicated that the maternal grandmother was the only individual other than the baby's parents who were involved in the baby's care. Also, based on her investigation, she did not learn any information that caused her to believe that, due to the timeframe and the nature of the injuries, there was anyone else besides the child's parents who could have caused injury to the child.

**Detective**

{¶ 19} Detective Cynthia Bazilius of the Cleveland Police Department's sex crimes and child abuse unit responded to an emergency call from the hospital regarding a baby who suffered a subdural hematoma. Based on information provided to her by the hospital staff, the police arrested appellant and Medley at the hospital. Also, she obtained a warrant to search appellant and Medley's house for a

hat because the medical staff informed her the baby's head was swollen and Medley told her that he had kept a hat on the baby's head for two or three days. She found it odd that the parents would keep a hat on a baby's head for days without removing it.

{¶ 20} On cross-examination, Detective Bazilius read her notes from an interview with appellant, who told her that appellant's mother lived with appellant's sister, and her sister's boyfriend would stay overnight on occasion when the baby stayed over with her mother. Appellant also gave the detective names of several individuals who had watched the baby. The detective however learned that all these individuals watched the baby only once, except for appellant's mother. Detective Bazilius acknowledged that the medical records showed the baby had been diagnosed with gastroesophageal reflux disorder, and he was frequently taken to the doctor for vomiting issues.

**Dr. McDavid**

{¶ 21} Dr. Lolita McDavid, the Director of Child Advocacy Protection at Rainbow Babies and Children's Hospital, testified the parents indicated that two to three days prior to his hospital admission on May 22, 2016, the baby had been "sleepy, drowsy, sluggish, not eating, and throwing up." The baby had been previously hospitalized due to poor feeding, failure to thrive, and vomiting, and was treated for reflux. Dr. McDavid reviewed the results of an MRI performed on the baby after the paramedic brought the baby to the hospital and also consulted with a neuroradiologist concerning the MRI results. The MRI showed that the baby had

bilateral subacute subdural hematomas. A subdural bleed means that blood is between the brain and the dura, which covers the brain. Bilateral means bleeding on both sides of the brain. Dr. McDavid testified that the baby's subdural hematoma was subacute, meaning that the injury was between 7 and 21 days old.

{¶ 22} According to Dr. McDavid, a subdural hematoma can be caused by being hit in the head or by shaking. If blood was seen behind the eyes it usually meant that the subdural hematoma was caused by a shaking motion. In this case, there was no indication that the baby's injury was caused by blunt force trauma. Based on bleeding being found within the retinal scan taken, Dr. McDavid opined that the baby's injuries were the result of shaking. She considered the cause of the baby's injuries to be "nonaccidental trauma" and found there were no other explanations for the injuries.

**Endangering Children Pursuant to R.C. 2919.22(A)**

{¶ 23} Appellant was convicted of endangering children in violation of R.C. 2919.22(A), which provides, in relevant part:

> No person, who is the parent * * * of a child under eighteen years of age * * *, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.

{¶ 24} Although R.C. 2919.22 does not provide for a culpable mental state for the crime of child endangering, the courts have held that a child endangerment conviction under R.C. 2919.22(A) requires proof of recklessness. *Cleveland Hts. v. Cohen*, 2015-Ohio-1636, 31 N.E.3d 695, ¶ 25 (8th Dist.); *State v. O'Brien*, 30 Ohio St.3d 122, 508 N.E.2d 144 (1987). Pursuant to R.C. 2901.22(C), "[a] person acts

recklessly when, with heedless indifference to the consequences, he [or she] perversely disregards a known risk that his [or her] conduct is likely to cause a certain result, or is likely to be of a certain nature." "Substantial risk" is defined as a "strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

{¶ 25} Appellant argues her conviction was solely based on her being the mother and a caretaker of the victim child "without any proof that the child suffered and [sic] injury from the mother's actions."

{¶ 26} Under the child endangering statute, affirmative acts of abuse are covered under division (B) of the statute. Appellant, however, was charged under division (A) of the statute, which is concerned with circumstances of neglect. *State v. Kamel*, 12 Ohio St.3d 306, 309, 466 N.E.2d 860 (1984). "[A]n inexcusable failure to act in discharge of one's duty to protect a child where such failure to act results in a substantial risk to the child's health or safety is an offense under R.C. 2919.22(A)." *Id.* "R.C. 2919.22(A) is aimed at preventing acts of omission or neglect when the breach results in a substantial risk to the health or safety of a child." *State v. Stewart*, 5th Dist. Stark No. 2007-CA-00068, 2007-Ohio-6177, ¶ 59, citing *State v. Sammons*, 58 Ohio St.2d 460, 391 N.E.2d 713 (1979), and *Kamel*.

{¶ 27} On the record before us, the state presented sufficient evidence to show appellant neglected her parental duties when she failed to timely seek medical attention for the victim child, in violation of R.C. 2919.22(A.) It is uncontested that

appellant's child suffered subacute subdural hematomas. The injury was severe enough that the child was admitted to the pediatric intensive care unit and hospitalized for more than three weeks. Under R.C. 2919.22(A), it is not necessary for the state to prove appellant's actions caused injuries to the victim child. The state is only required to prove she created a substantial risk to the health or safety of the child by violating a duty of care and protection in connection with the child's injuries.

{¶ 28} While the testimony shows the child had been sickly since birth and appellant had frequently sought medical attention to address his health issues, we note that a child endangering conviction may be supported by an isolated incident. *Cohen*, 2015-Ohio-1636, 31 N.E.3d 695, at ¶ 27. Dr. McDavid opined that the child's injury was 7 to 21 days old, and the testimony at trial shows that appellant was aware her child had been "sleepy, drowsy, sluggish, not eating, and throwing up" for two or three days prior to May 22, 2016. The severity of the child's symptoms so alarmed his grandmother that 911 was called immediately. The evidence, viewed in a light most favorable to the state, supports appellant's guilt pursuant to R.C. 2919.22(A) by showing that appellant recklessly neglected her parental duties in failing to seek timely medical attention for the child.

{¶ 29} Under the second assignment of error, which challenges the manifest weight of the evidence, appellant directs our attention to the fact that the jury found her not guilty of the furthermore clause (the violation "results in serious physical

harm") and argues that the verdict reflects a belief that "someone must pay some penalty, however meager, for the child's injuries."

{¶ 30} When reviewing a manifest-weight claim, we are to review the record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  Having reviewed the record, we cannot say the jury clearly lost its way in finding appellant guilty under R.C. 2919.22(A), which criminalizes a parent when he or she creates a substantial risk to the health or safety of a child by violating a duty of care or protection.   The first and second assignments of error are without merit.

{¶ 31} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, JUDGE

SEAN C. GALLAGHER, P.J., and
LARRY A. JONES, SR., J., CONCUR