**[Cite as *State v. Graham*, 2022-Ohio-3000.]**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## VAN WERT COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO.  15-21-12

      v.

MARQUIS J. GRAHAM,               O P I N I O N

      DEFENDANT-APPELLANT.

---

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO.  15-21-13

      v.

MARQUIS J. GRAHAM,               O P I N I O N

      DEFENDANT-APPELLANT.

---

**Appeals from Van Wert Municipal Court**
**Trial Court Nos. CRB 2100082 and CRB 2100083**

**Judgments Affirmed**

**Date of Decision:   August 29, 2022**

---

APPEARANCES:

      *Thomas J. Lucente, Jr.* **for Appellant**

      *Ben J. Bilimek* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Marquis J. Graham ("Graham"), brings these appeals from the November 29, 2021 judgment entries of the Van Wert Municipal Court wherein Graham's two convictions for endangering children were journalized. On appeal, Graham argues that there was insufficient evidence presented to convict him of both counts of endangering children, that his convictions were against the manifest weight of the evidence, and that he received ineffective assistance of trial counsel.

*Background*

{¶2} In late 2020/early 2021, Graham was in a romantic relationship with Brittany F. They resided together along with Brittany's 3-year old son, S.C., in the village of Middle Point in Van Wert County. Generally, when Brittany went to work for her 12-hour shifts, Graham took care of S.C. Although Graham was not S.C.'s biological father, he was trying to be a "parent figure" for him. (Tr. at 153).

{¶3} On February 4, 2021, while Brittany was at work and S.C. was in Graham's care, S.C. sustained multiple injuries and was vomiting blood. Once Brittany came home from work she took S.C. to the emergency room and he was treated for his injuries. Graham claimed that S.C. was injured by falling; however, the doctor that examined S.C. diagnosed S.C. with "nonaccidental trauma." (State's Ex. 5). S.C. also told the doctor that Graham had "spanked" him in the head.

{¶4} Law enforcement and children's services investigated the matter and during their investigation they learned of a prior incident wherein S.C. sustained injuries while solely in Graham's care. On December 10, 2020, Graham sent a text message to Brittany indicating that he had "cracked [S.C.'s] ass legitimately[.]" (State's Ex. 13). Photographs of bruising to S.C. on multiple parts of his body were taken near the date in question by S.C.'s step-great-grandmother.

{¶5} On March 2, 2021, Graham was charged in trial court case CRB2100082 with endangering children in violation of R.C. 2919.22(A), a first degree misdemeanor. This charge was related to the December 10, 2020 incident. On that same date, Graham was charged in trial court case CRB2100083 with endangering children in violation of R.C. 2919.22(A), a first degree misdemeanor. This charge was related to the February 4, 2021 incident.

{¶6} Graham pled not guilty to the charges and he proceeded to a consolidated bench trial wherein he was convicted in both cases. In trial court case CRB2100082 Graham was placed on 2 years of probation and given a suspended jail sentence of 180 days. In trial court case CRB2100083 Graham was sentenced to serve 180 days in jail. Final judgment entries memorializing Graham's sentences were filed November 29, 2021. It is from these judgments that Graham appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**Appellant's convictions for child endangerment were against the manifest weight of the evidence and contrary to law.**

**Assignment of Error No. 2**
**The defendant's right to due process of law was violated inasmuch as the convictions for child endangerment w[ere] based on insufficient evidence.**

**Assignment of Error No. 3**
**Defendant was denied the effective assistance of counsel as required by the Sixth Amendment to the U.S. Constitution.**

**{¶7}** We elect to address the assignments of error out of the order in which they were raised.

*Second Assignment of Error*

**{¶8}** In his second assignment of error, Graham argues that there was insufficient evidence presented to convict him in both endangering children cases.

Standard of Review

**{¶9}** "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Groce*, 163 Ohio St.3d 387, 2020-Ohio-6671, ¶ 6. Therefore, our review is de novo. *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, ¶ 3. In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus (superseded by constitutional

amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 102, (1997), fn. 4) following Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 (1979). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

## Controlling Statute

**{¶10}** In this case Graham was convicted of two counts of endangering children in violation of R.C. 2919.22(A), which reads as follows:

> **(A)  No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * ***

## Evidence Presented by the State

**{¶11}** Brittany F. went to work shortly before 7 a.m. on February 4, 2021. At the time she went to work, her 3-year old son, S.C., had no discernable injuries. S.C. was left in the care of Brittany's live-in boyfriend, Graham.

**{¶12}** According to Brittany, at around 10:40 a.m. she received a message from Graham that S.C. had "thrown up a large amount." (Tr. at 132). Graham indicated that he and S.C. had been "roughhousing like they usually did" prior to S.C. vomiting. Graham was worried because the vomit looked like "coffee grounds," which Brittany was concerned might be blood.  (*Id.*)

**{¶13}** Brittany was unable to leave work to return home until 3 p.m.  Because she worked in the "Covid unit" that day, she showered immediately upon returning

home. Afterward, when she observed S.C., she noticed a bruise on his forehead and some discoloration with one of his eyes. Brittany asked S.C. what happened and S.C. stated that he tripped over his slide. Brittany then took S.C. to the emergency room. Graham did not go with her.

{¶14} S.C. was examined at the hospital and he was found to have bruising to his face, and upper left foot. He had superficial excoriations on his face, the back of his neck, and above and behind his left ear. S.C. had "deeper contusions at the corner of the left eye, lateral to the right eye, chest, and top of foot." (State's Ex. 5).

{¶15} When the emergency room doctor asked S.C. how he was injured, S.C. said that he was "spanked in the head." (Tr. at 41). The doctor recalled S.C. stating that he was held against a wall and at some point he was "thrown down on the floor." (*Id.*) S.C. identified "Marquis" as the culprit. (*Id.* at 40). Some tests were run on S.C. and photographs of his injuries were taken.

{¶16} After examining S.C., the doctor felt that the blood in the child's vomit was most likely from blood in the nose dripping into the stomach. The doctor's ultimate diagnosis of S.C. was "nonaccidental trauma." (State's Ex. 5).

{¶17} Meanwhile, once Brittany left home to take S.C. to the emergency room, Graham began sending Brittany text messages. At one point Graham sent a message to Brittany that read, "* * * I just have a feeling that you think I'm beating

your child and your [sic] trying to get answers on what you should do[.]" State's Ex. 13). He then added, "And it's a strong feeling." (*Id.*)

**{¶18}** While Brittany and S.C. were at the hospital, Graham sent a text message asking for an update. Brittany was busy being interviewed and dealing with S.C. so she did not respond often or quickly. Graham then sent a message saying "Since you don't wanna answer I'm packing my shit and I'm leaving I'll bring your car back in the morning or do you want me to find a ride[]?" (*Id.*) Brittany replied that CPS had to be called because of the bruises on S.C. and she could not answer at the moment.

**{¶19}** Both Brittany and Graham were interviewed by police. Law enforcement felt that Graham's explanations during his interview were not consistent with the injuries to S.C. Further, while the matter was being investigated, law enforcement became aware of another incident wherein S.C. had been injured while in Graham's care in December of 2020.

**{¶20}** S.C.'s "step-great grandmother" testified that in December of 2020 she received S.C. to care for him and she found numerous bruises on S.C.'s body, including one in a "belt pattern." She took photographs of the injuries and they were introduced into evidence at trial.

**{¶21}** Graham acknowledged that S.C. was in his care when he was injured in December of 2020, but he claimed that the injuries occurred when S.C. fell off of

a swiveling bar stool and hit his head. Despite telling this story to Brittany, S.C.'s father, and law enforcement, Graham sent text messages in December that called his story into question. On December 3, 2020, Graham sent the following message to Brittany regarding S.C.:

> **If you want me to treat him the way I was treated growing up he'd be covered in bruises by the time you get home and my deal is you keep fucking questioning me like I don't know what I'm doing I'm a grown ass man, who's been down this road more time [sic] than you are old so none of this shit ain't knew [sic] to me but fasho [sic] the doors locked and he's in his room I'm gone[.]**

(State's Ex. 13).

{¶22} On December 10, 2020, the following text exchange occurred between Graham and Brittany:

> **GRAHAM:  I figured well I just talked to [S.C.] about yesterday and him putting his hands around your next [sic] and he wouldn't give me any other answer besides cause I wanted to so I cracked his ass legitimately and he's gonna spend the whole day in his room no toys no tv no nothing cause I don't play that and if you got a problem with that you can find somebody else to play stepdad or you can go back to dealing with it yourself but I don't play that shit what so ever [sic] I don't care how old your [sic] never supposed to do that cause your [sic] not getting your way**
>
> * * *
>
> **BRITTANY:  Babe I wasn't going to say anything ? As long as he gets fed (which I know you'll do) and gets to go pee, I understand his punishment**
>
> * * *

**GRAHAM: Okay that's fine but we're gonna have to make a new child because I'm gonna kill the one you got… he was supposed to be eating but instead he's playing the fucking chair and ends up falling over with the damn chair and now he has a big bruise on the back of his head he said he's okay and it didn't hurt but it look kinda bad babe**

**I didn't whoop him for it cause him falling was enough I just yelled at him for playing in the damn chair we're gonna have to go back to him eating at his little table from now on cause this can't happen again**

**Call me if you wanna know more[.]**

(*Id.*)

**{¶23}** A few days later, on December 13, 2020, the following text exchange occurred between Graham and Brittany:

**GRAHAM:  I already know you think I did it so why won't you just tell me that ?**

**BRITTANY:  Because I don't think you did it ? I know you love my son and wouldn't deliberately hurt him**

**You've claimed him as one of your own before, and I know you wouldn't hurt your kids… it hurts me that you think that I think you did it**

**GRAHAM:  Cause I know you… but whatever might as well get blamed for it since everybody already thinks I did it**

**BRITTANY:  Babe listen to me, we will talk to him and get this figured out.  You're not the villain to our little Spider-Man**

**GRAHAM:  I love the fact you think I be playing or love talking to hear myself talk…. So therefore like I said you can handle it all again from talkin to his daddy to everything else I'm not doing it anymore[.]**

(*Id.*)

**{¶24}** It was approximately sometime during the December 2020 dates that these text messages were exchanged that the photographs of bruising on S.C.'s body were taken by S.C.'s step-great-grandmother.

Analysis

**{¶25}** Graham contends that the preceding evidence presented at trial was insufficient to convict him of endangering children as charged in the complaints. Specifically, he argues that the evidence did not establish that he was acting "in loco parentis" or that he "created a substantial risk to the health or safety of the child," by violating a duty of care, protection, or support. In fact, Graham argues that the "bulk" of the evidence presented at trial was in an attempt to show that he abused S.C., which he contends could be sufficient for a prosecution of endangering children under R.C. 2919.22(B)'s specific "abuse" subsection,[1] but the evidence could not establish the different elements regarding creating an "environment" that was a "substantial risk" to the child as contained in R.C. 2919.22(A). In essence, Graham argues that he was charged with the wrong subsection of endangering children and that his actions here, even when viewed in the light most favorable to the State, did not satisfy the elements of the crimes he was convicted of.

---

[1] Revised Code 2919.22(B)(1) reads, "No person shall do any of the following to a child under eighteen years of age * * * (1) Abuse the child[.]"

{¶26} At the outset, we can readily reject Graham's argument that he did not stand *in loco parentis* to S.C. While living with Brittany and S.C. would not alone make Graham *in loco parentis* of S.C., *State v. Powers*, 4th Dist. Scioto No. 19CA3868, 2020-Ohio-7042, ¶ 90, Graham undertook the role of sole caretaker of S.C. while Brittany worked 12-hour shifts. During these times, Graham was solely responsible for bathing the child, feeding the child, disciplining the child, and otherwise caring for the child's well-being. Brittany described S.C.'s relationship with Graham as: "[S.C.] knew the difference between a dad and a father, but [S.C.] knew that [Graham] was a parent figure that he could have gone to when he needed something." (Tr. at 153).

{¶27} "A person who stands in loco parentis to a child has assumed similar duties to that of a guardian or custodian, only not through a legal proceeding." *State v. Noggle*, 67 Ohio St.3d 31, 1993-Ohio-189. When viewing the evidence in the light most favorable to the State, we do not find that insufficient evidence was presented to establish that Graham was acting *in loco parentis* of S.C.

{¶28} Next, Graham's contention that acts of affirmative abuse are not covered under R.C. 2919.22(A) and must be charged under R.C. 2919.22(B) has been directly rejected by multiple Ohio Appellate Courts. In *State v. Cook*, 1st Dist. Hamilton No. C-210142, 2021-Ohio-3841, ¶ 20, the First District Court of Appeals determined that an individual recklessly created a substantial risk to a child's health

under R.C. 2919.22(A)—the same statute that was charged here—where the child "was only four years old, [the defendant] lifted him by his neck, slammed him face-first onto the trunk of a hot car, and hit him on the head." In making its finding, the First District reasoned that "Acts of affirmative abuse are covered within R.C. 2919.22(A), including 'where a defendant has failed to protect the child from harm inflicted upon the child while in the defendant's care,' even when the defendant is the person who inflicted the harm." *Id*. at ¶ 15, quoting *State v. Klofta*, 2d Dist. Montgomery No. 28690, 2020-Ohio-5032, ¶ 32; *State v. Gaver*, 5th Dist. Stark No. 2015CA00204, 2016-Ohio-7055.

{¶29} *Cook*, and the other Ohio appellate cases cited in *Cook* establish that physical abuse can be properly charged under both R.C. 2919.22(A) and R.C. 2919.22(B) provided that the elements of the respective statutes are met. Importantly, the elements of R.C. 2919.22(A) were found to be met in *Cook* where the victim did not even have visible injuries. Here we have visible, documented, injuries to the child that a doctor specifically determined were from "nonaccidental trauma." Thus the evidence in this case was even stronger than what was found to be sufficient for a prosecution of R.C. 2919.22(A) in *Cook*.

{¶30} In sum, when viewing the evidence in the light most favorable to the State as we are directed, we do not find that there was insufficient evidence

presented to convict Graham of two counts of endangering children. For all of these reasons, Graham's second assignment of error is overruled.

### First Assignment of Error

{¶31} In his first assignment of error, Graham argues that even if there was sufficient evidence presented to convict him in both trial court cases, his convictions were against the manifest weight of the evidence.

### Standard of Review

{¶32} In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*.

{¶33} Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State*

*v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Evidence Presented by the Defense

**{¶34}** Graham testified in his own defense that he initially had a good relationship with Brittany and that he was "trying to be [S.C.]'s father, without being his father, if that makes sense." (Tr. at 158). Graham described himself as the cook of the house, and indicated that he regularly took care of S.C. while Brittany worked.

**{¶35}** As to the December 2020, incident, Graham stated that S.C. was alone in the next room when Graham heard a "loud crash." (Tr. at 159). Graham testified that when he came into the room where he heard the crash S.C. was trying to "pick the chair up." (*Id.*) Graham claimed that he asked S.C. what was wrong and S.C. said that he fell. Graham testified that after the incident he called Brittany and S.C.'s father to tell them about it. As to his text message where he said that he "legitimately" "cracked" S.C., he testified that he did not actually do that despite what he said.

**{¶36}** Regarding the February 4, 2021 incident, Graham testified that he was in the living room when he heard a "crash" from S.C.'s bedroom. Graham went in and looked and S.C. was going to the bathroom. Graham testified that he thought S.C. had fallen over the slide in his room but he was not sure. Graham emphasized

-14-

that he had spanked the child and had roughhoused with him but he had never intentionally harmed the child.

Analysis

**{¶37}** In arguing that his conviction was against the manifest weight of the evidence, Graham again argues that he was essentially charged with the wrong endangering children subsection. We rejected this argument already and we do so again now. *State v. Cook*, 1st Dist. Hamilton No. C-210142, 2021-Ohio-3841, ¶ 20.

**{¶38}** Graham also contends that even if there was sufficient evidence to show that he was acting *in loco parentis* of S.C., such a finding was against the weight of the evidence. However, Graham's own testimony only further supported the fact that he was acting *in loco parentis*. He stated that he was trying to be S.C.'s father, that he was the cook and caregiver, that he disciplined S.C., and that he was alone with S.C. when S.C. was injured. Therefore Graham's argument is not well-taken.

**{¶39}** Finally, as to Graham's claim that he had never intentionally harmed S.C., the mental culpability required for the crimes in question was recklessness, not purposeful. *State v. McGee*, 79 Ohio St.3d 193, 1997-Ohio-156. The trial court, acting as factfinder, was free to examine the evidence, weigh it, determine the credibility of the witnesses, including Graham, and find beyond a reasonable doubt that Graham acted at least in a reckless manner.

{¶40} In sum, after reviewing all of the evidence, and giving deference to the trial court's credibility determinations, *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967), we do not find that the trial court clearly lost its way or created a manifest miscarriage of justice in this matter by convicting Graham of two counts of endangering children. Therefore, Graham's first assignment of error is overruled.

### *Third Assignment of Error*

{¶41} In his third assignment of error, Graham argues that he received ineffective assistance of trial counsel.

### Standard of Review

{¶42} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689; *State v. Harris*, 3d Dist. Allen No. 1-21-30, 2021-Ohio-4559, ¶ 6.

Analysis

**{¶43}** Graham first argues that his counsel was deficient because his attorney failed to make a Crim.R. 29 motion for acquittal. While it is certainly the better practice for an attorney to make a Crim.R. 29 motion for acquittal in order to test the evidence in the trial court, there is no resulting prejudice for the failure to make such a motion.

**{¶44}** When an attorney makes a Crim.R. 29 motion for acquittal it *technically* preserves the sufficiency of the evidence argument under the "prejudicial" error standard of review rather than the "plain error" standard of review; however, this difference regarding standards with respect to sufficiency of the evidence has repeatedly been described as "academic" when considering Crim.R. 29 motions on appeal. *E.g. State v. Sepulveda*, 3d Dist. Mercer No. 10-16-03, 2016-Ohio-7177, ¶ 17; *State v. Klein*, 3d Dist. Union No. 14-12-09, 2013-Ohio-2387, ¶ 30, citing *Perrysburg v. Miller*, 153 Ohio App.3d 665, 2003-Ohio-4221, ¶ 75 (6th Dist.). "Regardless of the standard used, 'a conviction based on legally insufficient evidence constitutes a denial of due process,' and constitutes a manifest injustice." *State v. Klein*, 3d Dist. Union No. 14-12-09, 2013-Ohio-2387, ¶ 30, quoting *Thompkins,* 78 Ohio St.3d at 386–387, citing *Tibbs v. Florida,* 457 U.S. 31, 45, 102 S.Ct. 2211 (1982), and *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781

(1979). Thus under either the prejudicial error standard or the plain error standard, a conviction based upon insufficient evidence would result in reversal.

{¶45} Here, we have reviewed the evidence presented and found it to be sufficient to support the convictions on the state's evidence alone, even without consideration of Graham's testimony, thus a Crim.R. 29 motion would not have been properly granted in this matter. Therefore we do not find ineffective assistance of counsel for trial counsel's failure to raise this issue.

{¶46} Graham next claims that his attorney was ineffective for failing to call other potential witnesses. Specifically, he suggests that his attorney should have called a witness to show that S.C. was anemic and prone to bruising. Notably, Graham's attorney asked questions at trial about whether S.C. was anemic and he never received a response that S.C. was actually anemic. We do not find ineffective assistance of counsel based on speculation that another witness would have testified that S.C. was anemic. Moreover, even if S.C. was anemic and he did bruise easily, it would not change the facts of what occurred, and we find no resulting prejudice. Therefore, Graham's argument is not well-taken, and Graham's third assignment of error is overruled.

*Conclusion*

**{¶47}** For the foregoing reasons Graham's assignments of error are overruled and the judgments of the Van Wert Municipal Court are affirmed.

***Judgments Affirmed***

**ZIMMERMAN, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**