[Cite as *State v. Brady*, 2024-Ohio-1169.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
JEFFERSON COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

MATTHEW L. BRADY,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 23 JE 0003

---

Criminal Appeal from the
Court of Common Pleas of Jefferson County, Ohio
Case No. 2022-CR-17

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Judges and
William A. Klatt, Retired Judge of the Tenth District Court of Appeals,
Sitting by Assignment.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Jane M. Hanlin,* Jefferson County Prosecutor*, Atty. Frank J. Bruzzese*, Assistant Prosecutor, Jefferson County Prosecutor's Office, for Plaintiff-Appellee and

*Atty. Charles C. Amato*, Amato Law Office, for Defendant-Appellant.

Dated:  March 27, 2024

**Robb, P.J.**

{¶1} Defendant-Appellant Matthew L. Brady appeals from a child endangering conviction entered in the Jefferson County Common Pleas Court. He challenges the sufficiency and the weight of the evidence presented at his jury trial. For the following reasons, Appellant's conviction is affirmed.

<u>STATEMENT OF THE CASE</u>

{¶2} Appellant was indicted on two counts of child endangering after his seven-month-old child was hospitalized for shaken baby syndrome. (3/2/22 Ind.). Count one alleged Appellant recklessly created a substantial risk to the health or safety of his child by violating a duty of care, protection, or support, a felony of the third degree where the violation resulted in serious physical harm to the child. R.C. 2919.22(A),(E)(2)(c). Count two alleged he recklessly abused the child, a felony of the second degree due to the resulting serious physical harm. R.C. 2919.22(B)(1),(E)(2)(d).

{¶3} At the jury trial, the child's mother ("the mother") testified she was living in her parents' house with Appellant and their child on the evening of Thursday, January 20, 2022, when she saw Appellant shake the baby so hard that the baby's head whiplashed back and forth. (Tr. 195-199). She said she then saw Appellant hit the baby hard in the face. (Tr. 196-197, 199). According to her testimony, she told Appellant, "That's not right." (Tr. 200). She then went downstairs and smoked a cigarette. She said she was in shock and loved Appellant but was afraid of him. (Tr. 201, 207-208, 211, 241).

{¶4} On Friday, the mother noticed a mark on the baby's cheek, which was not there before Appellant struck him. (Tr. 205-206, 208). She went to visit her friend ("the babysitter") with the baby around noon while Appellant went to work with the babysitter's husband. (Tr. 203, 254). The baby was unusually fussy (rather than his usual happy self) and vomited, prompting them to take his temperature. (Tr. 205-207, 209). The men returned from work around 5 p.m. After the two couples visited for several hours, the parents decided to leave the baby overnight at the babysitter's house. (Tr. 211, 229, 253).

<u>Case No. 23 JE 0003</u>

{¶5}    On Saturday morning, the baby's grandmother woke the parents to tell them the babysitter called and wanted them to retrieve the baby (after the parents did not answer her calls on their cell phones).  (Tr. 212-213, 230).  When Appellant and the mother arrived around 10:00 a.m., the babysitter informed them the baby vomited all night and opined the baby needed to see a doctor.  (Tr. 213, 287).

{¶6}    The babysitter called and texted them all day instructing them to take the baby to the doctor and to the hospital.  (Tr. 215-216).  Eventually, Appellant called the baby's pediatrician.  (Tr. 214).  The pediatrician testified Appellant reported the baby was fussy and vomited a few times in the last few hours.  (Tr. 310-313, 315).  Appellant was advised to give the baby Pedialyte, and Appellant went out to buy this product.  (Tr. 233, 310).

{¶7}    As instructed by the pediatrician, Appellant called back Saturday evening. He reported the baby was doing "okay" with less vomiting, was not dehydrated (based on reported urine output), and was looking around.  (Tr. 310).  The pediatrician instructed him to report back the next morning.

{¶8}    On Sunday, the grandmother and the babysitter were still asking the parents to take the baby to the doctor.  (Tr. 216-217).  When Appellant called the pediatrician Sunday morning, he reported the baby had been periodically vomiting.  In addition, Appellant was now reporting the baby did not look right, had glassy-eyes, and was lethargic; he did not mention injuries or paleness.  (Tr. 314-315).  The pediatrician instructed Appellant to take the baby to the emergency room.  Appellant asked if he could wait until Monday and come to the doctor's office; however, the pediatrician said no.  (Tr. 311).

{¶9}    Three hours later, the parents took the baby to the local emergency room. (Tr. 288).  The baby's condition worsened while being diagnosed, and he was life-flighted to a hospital in Pittsburgh.  Before they left the local hospital, a deputy asked how the baby got hurt.  The mother testified she did not tell the deputy about the acts she witnessed Appellant commit because she was afraid of Appellant.  (Tr. 219). On Tuesday, she incriminated Appellant to a detective and gave a written statement (after initially telling him she did not know how the baby was injured).  (Tr. 221); (St.Ex. 1).  The mother was

charged with a third-degree felony for her failure to seek medical care for the child. (Tr. 239-240).

{¶10} The babysitter's testimony confirmed the baby arrived at her house with the mother around noon on Friday. The baby was pale, glassy-eyed, vomiting, not eating, and acting "really fussy" (when he usually "never cried"). (Tr. 251-252, 263, 269). When the babysitter asked about a bruise and knot on the baby's head, the mother told her it happened when the baby rolled out of bed. (Tr. 252, 263). However, the babysitter said the baby had never performed more than a half roll. (Tr. 263-264).

{¶11} After the parents left the baby with the babysitter, they would not answer their phones. For instance, the babysitter called around 9:30 p.m. because the baby was fussy. The babysitter gave the baby a bottle and teething tablets. (Tr. 255). The babysitter said she slept in her bed with the baby next to her in a baby "rocker" while her husband slept in the living room. (Tr. 254-255). The baby vomited and cried during the night. (Tr. 255).

{¶12} In the morning, she noticed a mark on the baby's face and said he "was just kind of laying there." He vomited when she tried to feed him. (Tr. 256). The babysitter called the baby's grandmother to tell her to have the parents retrieve their sick child. (Tr. 256-257). When the parents arrived for the baby, the babysitter told them the baby needed to see a doctor; Appellant shook his head, and the mother started crying. (Tr. 257-258). When the babysitter learned they did not go straight to the hospital, she sent multiple texts to encourage them to seek treatment. They responded by telling her the baby was fine and then said, "Stop telling us how to parent" and "Leave us alone." (Tr. 258, 268). They eventually stopped responding to her. (Tr. 259-260).

{¶13} The pediatrician from the Pittsburgh hospital testified the baby was transferred there due to vomiting and altered mental status. The baby had to be medicated due to seizures and was eventually intubated to breathe with drains placed in his brain. (Tr. 276, 280, 284). The head CT scan showed bilateral subdural hematoma. The bleeding was greater on the left side of the brain, where it reached the subarachnoid level. (Tr. 277-278). The hospital pediatrician diagnosed the child with shaken baby syndrome, which she described as a fast moving back and forth action so violent that it causes the vessels under the dura to be sheered. (Tr. 278-279).

**{¶14}** She explained that a baby could immediately stop crying after being shaken because the baby is "stunned" or "passed out." She also described how a victim's condition gets progressively worse because a shaking injury "takes time to fully blossom out into the brain" and pressure builds over time (and causes vomiting). (Tr. 285, 290-291). In addition to the shaken baby syndrome diagnosis, the pediatrician pointed to other evidence of physical abuse, which included the photographed bruises on the baby's cheek and inside the child's ear; she pointed out these abuse indicators were stronger considering the child did not roll yet. (Tr. 278-281).

**{¶15}** The hospital pediatrician noted the mother was tearful throughout the baby's bedside interview while Appellant did most of the talking. (Tr. 275). They claimed the baby was playful and did not vomit in the day on Friday. (Tr. 286-287). Appellant told the hospital pediatrician he mentioned the mark on the baby's face to the babysitter's husband when he retrieved the child from their house on Saturday. (Tr. 287). The pediatrician pointed out it can take hours for a bruise to develop. (Tr. 293). She concluded the injuries "absolutely" were consistent with the mother's testimony about witnessing Appellant's abusive acts on Thursday. (Tr. 297-298).

**{¶16}** The nurse at the local emergency room testified that after the CT scans showed the brain bleeds, Appellant voiced that he was going to hurt the babysitter. (Tr. 305-306). The nurse called the sheriff's office to report the baby's condition. Various photographs of the baby's face wound and bruised ear were displayed to the jury. (St.Ex. 2-4).

**{¶17}** A deputy testified he spoke to the parents at the local hospital after he took photographs as the helicopter was about to transport the baby. Appellant did most of the talking and seemed slightly confrontational. The mother had a blank stare and only spoke when a question was specifically directed to her; she cried and seemed timid. (Tr. 320, 324). Appellant blamed the babysitter and her husband for the baby's condition, telling the deputy he called the babysitter's husband to yell at him. (Tr. 321-322, 331, 336). Appellant's report claimed the baby was perfectly fine before they left him with the babysitter on Friday at 10:00 p.m. (Tr. 322). Appellant also acknowledged the babysitter's husband tried to call him twice while he was sleeping. (Tr. 321). Appellant reported when they arrived on Saturday, the baby vomited a few times, was lethargic,

was not acting like himself, and had a scratch on his cheek. (Tr. 321). The deputy testified Appellant was agitated with the amount of questions he was asked, including while being asked about his work schedule. (Tr. 327, 334-336).

**{¶18}** The jury entered a guilty verdict on the third-degree felony in count one but acquitted Appellant of the second-degree felony in count two. The trial court sentenced Appellant to twelve months in prison (with credit for 329 days of time served). (12/21/22 J.E.). The within appeal followed.

ASSIGNMENT OF ERROR

**{¶19}** Raising two distinct arguments, Appellant's sole assignment of error provides:

"The conviction of the Appellant for the charge of Child Endangering by Violating a Duty of Care or Protection or Support lacks sufficient evidence to make a finding of guilt beyond a reasonable doubt and therefore is against the manifest weight of the evidence in violation of Article IV, Section 3, of the Ohio Constitution and should be overturned."

**{¶20}** Sufficiency of the evidence and weight of the evidence are distinct concepts with different definitions and tests. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *Id.* at 386. An evaluation of witness credibility is not involved in a sufficiency review, as the question is whether the evidence is sufficient if it is believed. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring).

**{¶21}** In reviewing the sufficiency of the evidence, the court views the evidence, including reasonable inferences, in the light most favorable to the prosecution to ascertain whether "any" rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (consider all evidence in the light most favorable to the prosecution, including reasonable inferences); *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998).

*See also State v. Filiaggi,* 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999) (viewing reasonable inferences in favor of the state).

**{¶22}** The statutory elements required for Appellant's child endangering conviction under division (A) of R.C. 2919.22 are satisfied when a parent creates a substantial risk to the health or safety of their minor child by violating a duty of care, protection, or support. In order to support the elevated degree of the offense, an additional element requires the violation to have resulted in serious physical harm to the child. R.C. 2919.22(E)(2)(c), citing (A). "[T]he culpable mental state of recklessness is an essential element of the crime of endangering children." *State v. Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 (1980), paragraph one of the syllabus. "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). "A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." *Id.*

**{¶23}** Appellant says he did not recklessly create a substantial risk of harm by violating a duty to child when he kept in contact with the pediatrician instead of taking the baby to the emergency room. He says he followed the pediatrician's instructions and brought the baby to the hospital on the day instructed. He points to testimony indicating shaken baby syndrome can take time to manifest into noticeable symptoms. He points out he was found not guilty of the count of child endangering involving abuse under division (B) of R.C. 2919.22. He urges the law cannot punish a parent for every error in judgment involving a child's injury.

**{¶24}** An omission constitutes qualifying conduct for endangering children under division (A); an affirmative act need not be proven. *State v. Kamel*, 12 Ohio St.3d 306, 308-309, 466 N.E.2d 860 (1984) ("It is not necessary to show an actual instance or pattern of physical abuse on the part of the accused in order to justify a conviction under R.C. 2919.22(A). * * * an inexcusable failure to act in discharge of one's duty to protect a child where such failure to act results in a substantial risk to the child's health or safety is an offense under R.C. 2919.22(A)"). *Compare* R.C. 2919.22(B)(1) (endangering children

through abuse of the child, the second-degree felony child endangering charge in count two on which Appellant was acquitted).

{¶25} A defendant can commit an offense under division (A) of R.C. 2919.22 by failing to seek medical care or otherwise protect the child from the consequences flowing from the prior act of any person *including the prior act of the defendant* (even if the defendant was not indicted under (B) or was found not guilty of recklessly abusing the child under that division). *See, e.g., State v. Graham*, 3d Dist. Van Wert No. 15-21-12, 2022-Ohio-3000, ¶ 28; *State v. Cook*, 1st Dist. Hamilton No. C-210142, 2021-Ohio-3841, ¶ 15 (affirmative acts of abuse can be charged under division (A), including where the parent failed to protect the child from harm the parent himself inflicted); *State v. Klofta*, 2d Dist. Montgomery No. 28690, 2020-Ohio-5032, ¶ 14, 23-24, 31-35 (an inexcusable failure to act in discharge of a duty to protect a child can still occur where the defendant engaged in an affirmative act against the child); *State v. Gaver*, 5th Dist. Stark No. 2015CA00204, 2016-Ohio-7055, ¶ 50-59. For instance, a person may have negligently injured their child but then recklessly failed to seek medical treatment in violation of their duty of care or protection and thereby created a substantial risk to the health or safety of their child, causing serious physical harm.

{¶26} Where a baby suffered more than one subdural hematoma, the Eighth District found the state presented sufficient evidence to show a mother neglected her parental duties when she failed to timely seek medical attention for the child in violation of R.C. 2919.22(A). *State v. Boyd*, 8th Dist. Cuyahoga No. 108552, 2020-Ohio-3450, ¶ 27-28. The court pointed out the mother was aware her child had been drowsy, sluggish, not eating, and vomiting for two or three days prior to hospitalization and the child's condition was severe enough to require intensive care and weeks of hospitalization. In that case, the jury failed to find the additional element of serious physical harm and acquitted the parents of the abuse form of child endangering under division (B) of R.C. 2919.22. *Id.* at ¶ 3-4.

{¶27} Here, the mother testified that on Thursday night, she witnessed Appellant shake the baby so hard that his head whipped back and forth; she also said he then hit the child in the face. The jury ended up finding Appellant not guilty of the abuse form of child endangering. The mother and the babysitter testified the baby had a visible physical

injury on Friday and was vomiting and acting unusual. He usually "never cried" but was "really fussy" and not eating. He was pale with glassy eyes. Appellant was present at the babysitter's house for hours after work and then left the baby there overnight. Phone calls about the baby's condition were ignored by the parents.

{¶28} The baby vomited more Friday night and on Saturday morning, prompting the babysitter to call the baby's maternal grandmother in order to summon the parents to retrieve the baby. When the babysitter declared the baby needed to see a doctor, Appellant shook his head while the mother cried. The babysitter continued to prod the parents throughout the day about taking the baby to see a doctor at the hospital, but her pleas were angrily rejected and then ignored.

{¶29} Instead, Appellant called the pediatrician, but he only listed some of the baby's symptoms. Although Appellant told a deputy the baby was not acting like himself, was lethargic, and had a visible physical injury when he retrieved the child from the babysitter Saturday morning, Appellant did not mention these facts to the pediatrician he called on Saturday. Moreover, in the second phone call hours later, he gave the pediatrician the impression the baby was doing better. It was not until Sunday morning, with the baby still vomiting, that Appellant disclosed to the pediatrician that the baby was lethargic and glassy-eyed. He never mentioned a physical injury or paleness.

{¶30} When the pediatrician instructed Appellant to take the baby to the emergency room, Appellant said he wanted to wait until Monday to see the doctor; however, the pediatrician rejected this request. Appellant nevertheless waited at least three hours to go to the hospital where the baby needed major interventions due to bilateral subdural hematoma and was life-flighted to Pittsburgh. The baby's condition deteriorated as time passed and blood bloomed further around the brain. The brain bleeding caused seizures and required the administration of various medications and the insertion of brain drains and a breathing tube during his hospitalization.

{¶31} The question is merely whether *any* rational mind could find the disputed elements were established by the direct and circumstantial evidence. *Getsy*, 84 Ohio St.3d at 193. Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). This is unlike prior law stating where proof of an essential element of a crime is based

exclusively on circumstantial evidence, such evidence must be consistent only with a theory of guilt and irreconcilable with any reasonable theory of innocence. *See State v. Palmer*, 80 Ohio St.3d 543, 562, 687 N.E.2d 685 (1997).

**{¶32}** Upon viewing the evidence, including reasonable inferences, in the light most favorable to the prosecution, some rational juror could find beyond a reasonable doubt that Appellant created a substantial risk to the health or safety of the child by violating a duty of care, protection, or support and the violation resulted in serious physical harm to the child. Appellant's sufficiency argument is without merit.

**{¶33}** Weight of the evidence concerns the effect of the evidence in inducing belief, and our review would evaluate "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. The appellate court considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the state's burden of production involved in a sufficiency review). When a defendant claims the conviction is contrary to the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387.

**{¶34}** The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses and the weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 389. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "We therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events,

neither of which is unbelievable, we do not choose which one we believe is more credible." *State v. Carter*, 2017-Ohio-7501, 96 N.E.3d 1046, ¶ 105 (7th Dist.), citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist. 1999).

{¶35} Where a criminal case has been tried by a jury, only a unanimous appellate court can use its discretion to reverse on the ground that the verdict was against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 389, citing Section 3(B)(3), Article IV of the Ohio Constitution. We incorporate our above recitation of the evidence from our Statement of the Case and from our sufficiency review. Upon reviewing the entire record, we conclude this is not the "exceptional case" where the jury "clearly lost" its path as it weighed the evidence and created a "manifest miscarriage of justice" so as to require a new trial. See *Lang*, 129 Ohio St.3d 512 at ¶ 220.

{¶36} The jury heard the evidence, judged the credibility of various witnesses and declarants, and weighed the direct and the circumstantial evidence while making reasonable inferences. Appellant's acts, omissions, statements, and attitude as relayed by the testimony of others were for the jury to weigh and evaluate. As the state points out, the jury's ultimate decision to acquit Appellant of the more serious count of child endangering (the type requiring proof of abuse beyond a reasonable doubt) indicated they made a considered decision on the lesser count at issue in this appeal. On the count alleging a violation of R.C. 2919.22(A), the jury reasonably concluded Appellant recklessly created a substantial risk to the health or safety of his minor child by violating a duty of care, protection, or support with the violation resulting in serious physical harm to the child. The version of events corresponding to this set of elements was not unbelievable. Consequently, the jury's verdict convicting Appellant of child endangering in violation of R.C. 2919.22 (A) was not contrary to the manifest weight of the evidence.

{¶37} For the foregoing reasons, Appellant's assignment of error is overruled, and his conviction is affirmed.

Waite, J., concurs.

Klatt, J., concurs.

Case No. 23 JE 0003

[Cite as *State v. Brady*, 2024-Ohio-1169.]

_____

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Jefferson County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**